UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                            :
WILLIE M. BUTLER,                                           :
                                                            :
                              Plaintiff,                    :
                                                            :          20 Civ. 10044 (JPC)
              -v-                                           :
                                                            :          FINDINGS OF FACT AND
                                                            :          CONCLUSIONS OF LAW
UNITED STATES OF AMERICA,                                   :
                                                            :
                              Defendant.                    :
                                                            :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Plaintiff Willie M. Butler ("Butler"), a now 71-year-old woman who suffers from diabetes

and hypertension, brings this medical malpractice action against Defendant United States of

America (the "Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b),

1402(b), 2401(b), 2671-80.  She alleges that medical providers at Greenburgh Health Center

("Greenburgh"), a federally supported health center in Westchester County, New York, deviated

from the applicable standard of medical care by refilling her medication, but without seeing her at

medical visits, during the period of December 3, 2016 to March 28, 2019.  She contends that this

substandard care exacerbated her diabetes and led to an infection that eventually required a below-

the-knee amputation of her right leg.

        The Court conducted a five-day bench trial from January 17 through January 23, 2023.[1]

Having considered the evidence admitted at trial, assessed the credibility of the witnesses, and

_____

        [1] "Tr." refers to citations to the trial transcript.  Dkts. 48, 50, 52, 54, 56.  Exhibits received
at trial were marked JX, PX, and GX.  The exhibits primarily relied upon at trial were JX-1 (records
from Greenburgh), JX-4 (records from White Plains Hospital), and GX-3 (excerpts from Butler's

applied the relevant law, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  As discussed below, the Court concludes that Butler failed to prove any deviation from the standard of care in her treatment on the part of Greenburgh or any of its employees.  Furthermore, even if any such deviation had occurred, Butler failed to establish causation, as she did not show a causal link between any act or omission by Greenburg or its employees and her injuries.

## I.  Procedural Background

On September 17, 2019, Butler filed an administrative claim, SF-95, with the United States Department of Health and Human Services, in which she alleged as the basis of her claim:

> Ms. Butler suffers with diabetes and hypertension and had been under the care of the doctors at Greenburgh Health Center.  The facility continued to renew her medications but had not examined her since 2016.  By the time her family came to see Ms. Butler in her home, they noticed a very bad stench.  They soon found parts of her toes had fallen off her foot.  The negligent medical treatment caused claimant to lose her leg from the knee down, lose most of her eyesight and suffer with additional damages.

GX-1 at 1; Dkt. 12 ¶ 5.  She further alleged that she "was taken to the emergency room where [her] right leg, below the knee, was amputated.  Her vision has also become severely impaired and other injuries resulting from complications of diabetes treated negligently."  GX-1 at 1.

Butler commenced this action on December 1, 2020.  Dkt. 1.  In her Complaint, she alleges medical malpractice pursuant to the FTCA in connection with treatment she received and did not receive from medical providers at Greenburgh and seeks damages for her injuries.  Dkt. 5

---

deposition).  Stipulations agreed to by the parties in the Joint Pretrial Order are referred to herein as "Stip."  *See* Dkt. 42, VI.

("Compl.").[2]  The Government answered on February 22, 2021.  Dkt. 12.[3]  The Government asserts

that medical providers at Greenburgh properly treated Butler and did not deviate from the

applicable standard of care.  *Id.* at 5.  The Government further contends that any treatment provided

to Butler at Greenburgh was not the proximate cause of any damages she suffered.  *Id.* at 6.

Discovery closed on June 24, 2022.  Dkt. 34.  At a conference on July 7, 2022, the Court

scheduled a bench trial to begin on January 17, 2023.  Dkt. 37; *see* 28 U.S.C. § 2402.  The bench

trial commenced as planned on that date and concluded on January 23, 2023.  Butler testified on

her own behalf, Tr. at 12:1-89:1, and also called Glenn Davis, MD, a doctor at Greenburgh, *id.* at

90:11-151:2; Barbara Lynch, a registered nurse practitioner ("RNP") at Greenburgh, *id.* at 238:6-

334:2; Sharon Knight, a registered nurse ("RN") and a care manager at Greenburgh, *id.* at 334:18-

363:1; Vladimir Lokshin, MD, an expert witness, *id.* at 158:25-236:25; Butler's son, William

Butler, *id.* at 406:16-443:12; her daughter-in-law, Aquira[4] Butler, *id.* at 390:11-402:14; and her

niece, Deborah Williams, *id.* at 369:8-389:14.  The Government called three expert witnesses: Dr.

Alan Roth, *id.* at 449:8-558:11, Dr. Peter Goulden, *id.* at 558:19-579:6, 677:7-700:16, and Dr. Tzi

Bar-David, *id.* at 586:24-676:20.

---

[2] Butler is not seeking damages for past lost income, future lost income, or future medical expenses.  Stip. ¶ 6.

[3] The Complaint originally named as defendants "RNP Barbara Lynch" and "MD Glenn Davis," who are employees of Greenburgh.  Compl. ¶¶ 10, 16-25.  On December 12, 2022, the Court entered a stipulation dismissing those individuals as defendants because the United States of America is the only proper defendant for Butler's claim under the FTCA.  Dkt. 41.

[4] While the parties refer to this witness as "Megan" Butler, she testified at trial that her name was "Aquira."  Tr. at 390:17-18.  Accordingly, the Court refers to her as "Aquira Butler" in these Findings of Fact and Conclusions of Law.

## II.   Bench Trial Standard

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  Accordingly, the Court below sets forth its findings of facts, *see infra* III, followed by its conclusions of law, *see infra* IV.  Additional facts not specifically found in the findings of fact section may nonetheless be included in the Court's conclusions of law.  *See Flatiron Acquisition Vehicle, LLC v. CSE Mortgage LLC*, 502 F. Supp. 3d 760, 769 (S.D.N.Y. 2020) ("For the avoidance of doubt, the Court has also found additional facts that are relevant to the analysis, which are not included in this section of the opinion, but are instead embedded in the discussion section.").

## III.   Findings of Fact

### A.   Butler's Background

Butler, a 71-year-old resident of White Plains, New York, has long suffered from diabetes and hypertension.  Tr. at 12:19-22, 17:7-23; Stip. ¶¶ 1-2.  In 1976, she received a nursing license from BOCES in Valhalla, New York.  Tr. at 13:6-24.  From 1976 until the early 1990s, Butler worked at White Plains Hospital where, among other things, she treated patients with hypertension and diabetes.  *Id.* at 13:25-14:15, 60:3-62:2.  Butler then worked at a nursing home and in private home care until she retired in 2013.  *Id.* at 14:16-16:15.

Butler has a son, William Butler, and a daughter, Lolita Williams.  *Id.* at 16:17-20.  William Butler is married to Aquira Butler.  *Id.* at 16:23-17:1. Butler also has a niece named Deborah Williams who lives in the Westchester area.  *Id.* at 17:2-6.

### B.   Butler's Initial Treatment at Greenburgh through December 2016

Greenburgh, a medical facility located in Westchester County, is an approved delivery site of Mount Vernon Neighborhood Health Center, a not-for-profit, federally supported health center

that provides healthcare services to underserved individuals and families in low-income neighborhoods.  Stip. ¶ 4.  Butler started receiving medical care at Greenburgh in April 1980.  *Id.* ¶ 3; *see* Tr. at 17:24-18:5 (Butler testifying that she was unsure when she started going to Greenburgh, but knew that the doctor who initially treated her has since left).  She was 66 years old at the time of her last treatment at Greenburgh in March 2019.  Tr. at 12:19-22; Stip. ¶ 1.

The first visit relevant to this action occurred on February 3, 2015, when Butler was seen at Greenburgh by RNP Barbara Lynch for a physical examination and a medication refill.  JX-1 at 71-75.  Butler, who reported that she had been cleaning snow that day and had failed to take her blood pressure medication, registered a blood pressure of 244/105.  Tr. at 287:20-288:5, 290:5-10; 459:9-14; JX-1 at 71-72.  The examination further revealed her weight to be 121 pounds, with no skin symptoms, lesions, or rash.  JX-1 at 71-72.  During this February 3, 2015 visit, RNP Lynch also performed a foot examination of Butler, which entailed checking her feet's pulses, coloration, and capillary refill, as well as for any wounds, bruises, or neuropathy.  Tr. 291:2-292:6.[5]  That foot examination did not reveal any abnormalities.  *Id.* at 294:15-19.  RNP Lynch prescribed Butler Hydrochlorothiazide 25 mg per day, Lisinopril 40 mg per day, Metformin 2000 mg per day, and Metoprolol 100 mg per day.  JX-1 at 78; Tr. at 295:4-5.  Because Butler had mentioned having

---

[5] While RNP Lynch's notes do not clearly reflect this foot examination, *see* JX-1 at 71-75; Tr. at 246:9-247:6, the Court finds that RNP Lynch did in fact conduct this foot examination of Butler based on RNP Lynch's testimony, which the Court finds credible.  RNP Lynch testified that she saw "anywhere from 14 to 21 up to 25 patients" per day and 100 patients per week.  Tr. at 284:18-23.  RNP Lynch could not have documented everything that took place during a patient's visit, given that volume of daily patients.  Further, RNP Lynch testified that she conducts "foot checks" "every time the patient comes in for a visit," referring to the examination as "routine."  *Id.* at 242:6-7, 242:22.  She further explained at trial what the foot examination entails: "you check the pulses, you check capillary refill, you check [if] there's any crack, there's any opening, any blister, any wound.  You check for discoloration.  You check for reflexes.  You check for edema, and you check pulses."  *Id.* at 242:8-12; *see also id.* at 292:7-293:1 (RNP Lynch explaining the importance of foot examinations).

cataracts, RNP Lynch referred Butler to an ophthalmologist, whom Butler saw about a month later. Tr. at 295:19-296:19.

Butler was seen again by RNP Lynch at Greenburgh on February 6, 2015.  Tr. at 298:16-21; JX-1 at 67-70.  Butler reported that she again had not taken her blood pressure medication that day.  JX-1 at 69; Tr. at 300:4-19.  Her blood pressure was taken twice during this visit, registering at 215/91 and 248/105. Tr. at 299:2-3.  RNP Lynch instructed Butler on the importance of taking her medications regularly and at the same time each day, which Butler appeared to understand. JX-1 at 69; Tr. at 300:4-19.[6]  RNP Lynch prescribed Clonidine 0.1 mg per day and ordered follow-up in two weeks.  Tr. at 300:21-301:19, 469; JX-1 at 69.  Butler's laboratory results were as follows: A1C 7.3%[7]; total cholesterol 303 mg/dL (normal total cholesterol is 100-199 mg/dL); and LDL 203 mg/dL (normal LDL is 0-99 mg/dL).  JX-1 at 3-4.  Butler's physical examination, which included a neurological and skin examination of her feet, was normal.  Tr. 299:6-300:3; JX-1 at 68.

Butler's next appointment at Greenburgh was scheduled for February 17, 2015, but she failed to show up.  JX-1 at 66.  In response, Greenburgh sent her a letter emphasizing the need for her to reschedule the appointment.  *Id.*; Tr. at 254:24-255:2.  Greenburgh sent another letter to

---

[6] While Butler disputes that RNP Lynch provided her with education during her visits, Tr. at 730:14-18, the Court finds that such education occurred at each visit.  The Court credits RNP Lynch's testimony that "[e]ducation is always given to the patient at the end of their visit and throughout the visit," *id.* at 244:7-8, and such education was repeatedly documented in RNP Lynch's notes, *see* JX-1 at 17-18, 23, 29-30, 34-35, 40, 44-45, 52, 59, 69, 74.

[7] While an A1C level between 5.7% to 6.4% indicates prediabetes, an A1C level less than 7% in diabetic adults indicates good glucose control.  *See* Tr. at 469:12-470:3.

Butler on March 4, 2015, asking her to return to the clinic as soon as possible to review her test results.  Tr. at 302:20-303:12; JX-1 at 64.[8]

Butler finally returned to Greenburgh on March 27, 2015, when she was again seen by RNP Lynch.  Tr. at 255:23-25; JX-1 at 57-63.  And once again, Butler revealed that she had not taken her blood pressure medications.  Tr. at 304:5-9; JX-1 at 57.  At this visit, she registered a sitting blood pressure of 241/94.  Tr. at 304:20-23; JX-1 at 58.  An examination of Butler's feet and legs, including neurological and skin, was normal.  Tr. at 305:1-306:3; JX-1 at 58.

Butler returned to Greenburgh on April 2, 2015, and once again was seen by RNP Lynch. Tr. at 265:2-9; JX-1 at 50.  At this visit, Butler registered a sitting blood pressure of 240/87.  JX-1 at 51; Tr. at 306:15-19.  And once again, Butler's examination, including a neurological and skin examination of her feet, was normal.  Tr. at 306:20-22; JX-1 at 51.  RNP Lynch advised Butler about the importance of a low-sodium diet and regular exercise to help control her blood pressure. Tr. at 306:24-307:10; JX-1 at 52.  RNP Lynch advised Butler to return in three to four months for follow-up and repeat laboratory tests.  Tr. at 307:11-18.  Butler did not return to Greenburgh for fifteen months, however.  Tr. at 62:3-17.

On July 14, 2016, Butler again saw RNP Lynch.  JX-1 at 43-49.  Butler's sitting blood pressure was recorded as 220/105.  JX-1 at 44; Tr. at 307:21-23.  Yet again, RNP Lynch's physical examination of Butler's feet, including neurological and skin, was normal.  Tr. at 307:24-25; JX-1 at 44.  RNP Lynch added two medications to Butler's regimen: Amlodipine 5 mg daily and Simvastatin 10 mg daily.  JX-1 at 45.  RNP Lynch prescribed Simvastatin in particular for cholesterol control and to protect Butler's kidneys, explaining that Butler's failure to return for

---

[8] In the interim, on March 3, 2015, Butler attended an ophthalmology visit at Greenburgh and was advised to follow up in four weeks, but there is no record of her returning for that follow-up visit.  Tr. at 296:9-19; JX-1 at 143.

follow-up visits led RNP Lynch to conclude that lifestyle alterations were not working.  Tr. at 309:9-20.  RNP Lynch counseled Butler about diet, exercise, and diabetes, including glucose monitoring, home insulin administration, and diabetic foot care.  Tr. at 308:1-25; JX-1 at 44-45. RNP Lynch also recommended that Butler return in one month.  JX-1 at 45.

Butler returned to Greenburgh on August 15, 2016 to review with RNP Lynch the results of blood tests that were taken on August 10, 2016.  Tr. at 309:24-310:25; JX-1 at 6, 38-42.  The results reflected that Butler's blood glucose was 106 mg/dL (normal is 65-99 mg/dL); A1C was 6.5% (much improved; in adult diabetics, an A1C less than 7% indicates good glucose control, *see supra* fn. 7); total cholesterol was 210 (much improved from her prior cholesterol result of over 300, although still higher than normal, which is 100-199 mg/dL); and her LDL was 106 (normal LDL is 0-99 mg/dL).  JX-1 at 6-7; Tr. at 310:5-20.  Butler's sitting blood pressure registered at 217/102—"much better than all the other readings," according to RNP Lynch.  Tr. at 311:1-5; JX-1 at 39.  A routine physical examination of Butler's feet, including neurological and skin, was normal.  Tr. at 311:6-8.  Once again, RNP Lynch counseled and educated Butler about diet and exercise.  JX-1 at 40; Tr. at 311:10-15.  RNP Lynch increased Butler's Amlodipine dosage to 10 mg daily and ordered a follow-up visit in two weeks.  Tr. at 311:18-312:2; JX-1 at 40.

Butler returned to Greenburgh two weeks later, on August 29, 2016, and was seen by RNP Lynch.  Tr. at 268:4-6, 312:3-5; JX-1 at 33.  Butler's sitting blood pressure was recorded as 193/92 (a continued decrease), and again her foot examination, including neurological and skin, was normal.  JX-1 at 34; Tr. at 312:7-14.  RNP Lynch again counseled Butler on diet and exercise and urged Butler to return in one month.  JX-1 at 34-35.

Just over a month later, on October 3, 2016, Butler returned to Greenburgh for an appointment with RNP Lynch.  Tr. at 268:10-12; JX-1 at 28-31.  Butler's sitting blood pressure

was recorded as 197/94, and again a routine physical examination of her feet, including neurological and skin, was normal.  JX-1 at 29; Tr. at 312:17-20.  As she did at prior visits, RNP Lynch counseled Butler on diet and exercise.  JX-1 at 29-30.  This time, RNP Lynch also ordered Butler a home blood pressure monitor.  Tr. at 312:22-6; JX-1 at 30.  RNP Lynch recommended that Butler return in one month. 313:5-6; JX-1 at 30.

Butler returned to Greenburgh on November 3, 2016, and was seen by RNP Lynch again.  Tr. at 268:18-22; JX-1 at 21-27.  Butler's sitting blood pressure was recorded as 162/87, which was much improved compared to previous readings, and, once again, a physical examination, including neurological and skin, was normal.  Tr. at 313:11-17; JX-1 at 22.  RNP Lynch counseled Butler on diet and exercise and recommended that Butler return in two weeks.  JX-1 at 23.  RNP Lynch also ordered laboratory work for Butler, including A1C testing, which was conducted on November 30, 2016.  Tr. at 313:18-314:2; JX-1 at 8, 23.

Butler's final visit with RNP Lynch occurred on December 6, 2016.  Tr. at 269:1-3; JX-1 at 16.  At this visit, Butler's sitting blood pressure was 177/86, and a routine physical examination of her feet, including neurological and skin, was once again normal.  JX-1 at 17; Tr. at 314:15-25.  The laboratory results from November 30, 2016 reflected that Butler's A1C was 6.9%.  JX-1 at 8; Tr. at 314:3-8.  Her lipid panel was within a normal range: total cholesterol was 198 (normal 100-199 mg/dL), triglycerides was 126 (normal 0-149 mg/dL), HDL was 63 (normal >39 mg/dL), and LDL cholesterol was 110 (normal 0-99 mg/dL).  JX-1 at 8.  RNP Lynch assessed Butler's health as much improved since 2015.  Tr. at 315:1-6.  RNP Lynch counseled and educated Butler about diet, exercise, and diabetes, including glucose monitoring, home insulin administration, and diabetic foot care.  JX-1 at 18; Tr. at 314:17-21.  Butler's prescribed medications at this time included Amlodipine 10 mg, Clonidine .1 mg, Hydrochlorothiazide 25 mg tablet, Lisinopril 40

mg, Lisinopril 20 mg, Metformin 1000 mg, and Simvastatin 10 mg (all once per day, except Metformin which was twice per day). JX-1 at 16. RNP Lynch instructed Butler to return to Greenburgh in three months for a follow-up appointment. Tr. at 315:6-14; JX-1 at 18.

## C.    December 2016 through March 28, 2019

Despite being advised by RNP Lynch at the December 6, 2016 visit to return to Greenburgh in three months, Butler did not return to the health center until March 28, 2019, nearly 2.5 years later. Tr. at 62:21-24, 269:12-16. During this time, RNP Lynch continued to renew Butler's prescriptions. *Id.* at 272:22-273:2. For each refill request, RNP Lynch would access Greenburgh's computer system to review the patient's chart, photograph, and identifying information before writing a new prescription. *Id.* at 273:11-274:17, 318:2-12. RNP Lynch testified that she spends approximately one hour each week issuing prescriptions in this manner. *Id.* at 273:14. With respect to Butler's prescription renewals, RNP Lynch determined that the benefits of Butler remaining on her medication despite failing to appear for an appointment at Greenberg outweighed any risks. *Id.* at 318:13-319:12.

Butler explained that she did not return to Greenburgh for so long because she had no problems and was taking her medication. *Id.* at 32:12-15, 62:21-24. By all accounts, Butler enjoyed an active lifestyle during this time period, which entailed exercising, attending church, teaching Sunday school, singing in choir, working as a missionary, reading in the library, and caring for others. *Id.* at 40:14-19, 68:15-69:11, 371:19-20. Butler's niece, Deborah Williams, recalled that from 2017 through March 2019, Butler would do laundry, go out to eat, attend church events, and visit friends and family, and otherwise led an active and normal life. *Id.* at 371:16-372:1, 375:20-377:11, 408:16-19.

According to Butler, she experienced no problems with her feet at any point when she was attending medical visits at Greenburgh through 2016, or from 2017 through mid-March 2019. *Id.* at 62:18-20, 62:25-63:15. She regularly examined her own feet, and they were generally fine. *Id.* at 70:11-71:3, 74:13-75:2. She also monitored her glucose from 2017 to 2019, and her levels stayed within a healthy range. *Id.* at 69:22-70:10. Her son, William Butler, similarly recalled that from 2017 through early 2019, a period when he regularly saw his mother, *id.* at 416:21-417:21, she was able to walk without difficulty, *id.* at 418:2-8, she regularly checked her blood pressure and glucose, *id.* at 418:11-14, and she took her medication, *id.* at 418:9-10. William Butler also did not notice his mother experiencing any vision problems. *Id.* at 417:22-24.

Butler explained, however, that at some point around 2019, her feet started to swell and became odorous. *Id.* at 38:15-25. She testified that, in mid-March 2019, she experienced no pain in her feet, only swelling. *Id.* at 80:17-20. Rather than return to Greenburgh, however, she decided to take Tylenol for the problem. *Id.* at 80:20-21. William Butler asked his mother whether she was seeing a doctor, given the odd smell that he also noticed. *Id.* at 419:4-16. While Butler repeatedly told her son that she was being seen by a doctor, William Butler later learned that not to be the case. *Id.* at 419:17-423:7.

Deborah Williams, Butler's niece, testified that during this time period, Butler appeared to be in relatively good health. *Id.* at 377:13-23. She did notice, however, that Butler appeared to be having some issues with her feet, but Butler assured her that everything was fine. *Id.* at 383:14-23. For example, on one occasion in March or April 2017, Williams observed one of Butler's feet looking black and discolored. *Id.* at 372:22-25, 373:13-16. Butler told Williams that she had hit her foot walking down the stairs. *Id.* at 377:24-379:25. When Williams expressed concern to Butler about her foot, Butler responded that she was "taking care of it" and had "spoke[n] to a

11

doctor." *Id.* at 374:10-15.  On another occasion, Butler complained to Williams about her feet getting larger, becoming uncomfortable, and requiring larger boots, which Butler eventually obtained.  *Id.* at 35:21-36:7, 382:4-13.  Butler also asked Williams to purchase gauzes and bandages for her feet.  *Id.* at 370:6-7, 383:24-384:8.

Aquira Butler, Butler's daughter-in-law and William Butler's wife, testified that from March 2017 to mid-March 2019, Butler seemed to be in general good health.  *Id.* at 398:9-399:11. On or around March 12, 2019, however, when William Butler had surgery, Aquira Butler took Butler to the hospital, *id.* at 393:9-23, and noticed that Butler was low-energy, foggy, not making eye contact, barely responsive, and not communicating well, *id.* at 394:7-10, 394:22-24, 399:19-400:2.  Although Butler had brought a cane with her and was able to stand, she could not walk. *Id.* at 394:15-19, 400:3-7.  As a result, Aquira Butler used a wheelchair to transport Butler around the hospital.  *Id.* at 394:15-19; 400:8-11.  Aquira Butler also recalled the smell of dying flesh emanating from Butler.  *Id.* at 395:6-14, 400:12-17.  Alarmed, Aquira told her husband, William, about Butler's demeanor and odor.  *Id.* at 400:21-401:14.

In mid-March 2019, Butler finally called Greenburgh to make an appointment but was not able to get one for two weeks.  *Id.* at 41:6-11.  Still, during her call scheduling this appointment, Butler did not advise Greenburgh of the problems she was experiencing or otherwise express any urgency in needing medical care.  *Id.* at 41:12-16, 83:13-19.  Nor did she go to an emergency room for her feet issues.  *Id.* at 83:23-84:2.  Butler explained that she did not do so because she only had swelling in her feet and was not experiencing pain.  *Id.*.

**D.  March 28, 2019 Visit**

Butler visited Greenburgh for her right foot pain and malodor on March 28, 2019.  *Id.* at 138:19-22, 140:24-25.  This time, Butler was seen by Dr. Glenn Davis.  *Id.* at 129:23-25.  Dr.

Davis's clinic notes reflect that Butler had been "self dressing," JX-1 at 10, which meant that Butler was actively "treating herself" at home "[u]sing non-medical recommended means." Tr. at 141:1-6.  During her visit with Dr. Davis, Butler reported her pain level to be seven out of ten, her sitting blood pressure registered at 131/72, and her body temperature was 98 degrees.  JX-1 at 11; Tr. at 142:14-22.  Following an examination, Dr. Davis diagnosed skin lesions and purulent diabetic foot ulcers on the medial and lateral aspects of Butler's right foot.  JX-1 at 11; Tr. at 143:5-10.  Dr. Davis referred Butler to the emergency room at White Plains Hospital for vascular and wound care consultations for the ulcers.  Tr. at 84:7-9, 131:7-12.

During the March 28, 2019 visit at Greenburgh, Butler also met with Sharon Knight, RN, a care manager at the clinic.  *Id.* at 335:8-13, 339:15-17, 343:24-25; JX-1 at 13.  RN Knight spoke with Butler, who was in a wheelchair, as well as with Butler's son, William Butler, and her niece, Deborah Williams, who had accompanied Butler.  Tr. at 345:10-20.  Upon meeting Butler, RN Knight immediately noticed a "foul," "rotten" smell akin to a "neglected ulcer."  *Id.* at 346:20-347:4.  In creating a care management plan for Butler, RN Knight comprehensively documented Butler's medical condition as reported by Butler and her family members.  *Id.* at 348:8-15; *see* JX-1 at 13-15.

According to RN Knight's note, Butler lived alone, but her family lived close by and performed "wellness checks" on her.  JX-1 at 13; Tr. at 349:17-350:4.  William Butler expressed concern about his mother's declining health and ability to remain independent, and requested a home health aide.  JX-1 at 13; Tr. at 356:8-15.  He also expressed concern regarding his mother's hygiene because he thought the odor emanating from her body was due to poor hygiene, but RN Knight felt the odor was possibly from Butler's foot.  JX-1 at 13; Tr. at 340:15-341:9, 347:19-348:2, 348:22-349:16.  Williams reported to RN Knight that she had asked Butler about her foot

and suspected that Butler had a bad wound, but Butler was self-dressing and only asked her niece to buy different boots, after which Butler's complaints subsided.  JX-1 at 13-14; Tr. at 35:21-36:7, 341:10-15, 350:5-351:9.  Williams further informed RN Knight that she believed Butler hit her foot some years ago and was self-treating that injury.  JX-1 at 14; Tr. at 351:14-23.  Williams explained to RN Knight that, one day as Butler walked up the stairs, Williams observed that Butler's foot looked black, but Butler assured Williams that she was okay.  JX-1 at 14; Tr. at 351:14-23.  In addition, William Butler was surprised and very upset to learn during this meeting that his mother had not been seen at the clinic since 2016, as he understood that she was receiving regular medical care.  JX-1 at 14; Tr. at 352:16-353:21.  Butler also claimed to RN Knight she was walking independently, but William Butler corrected this statement, explaining that his mother used anything she could to assist in walking.  JX-1 at 14; Tr. at 357:7-25; *see also* Tr. at 39:18-22 (Butler testifying that she was able to walk around the hospital at the time of her son's surgery in mid-March 2019).  The family members also reported to RN Knight that Butler had a cane, but it was not kept handy.  JX-1 at 14.  William Butler further stated that his mother ate everything without restriction, even though she knew she should cut down on her starches.  *Id.*  Butler denied experiencing fever, nausea, vomiting, or headaches.  *Id.*

After the session with RN Knight, Butler was immediately transported by a van provided by Greenburgh to White Plains Hospital.  Tr. at 84:10-25, 386:12-19.

## E.    Treatment at White Plains Hospital and Amputation

Upon arriving at White Plains Hospital, Butler was seen in the Emergency Department. JX-4 at 40; Tr. at 600:10-601:2.  The admission note documented that "[a]s per family, the patient banged her foot 2 years ago and family has been trying to get her to see a doctor since which she has not done" but instead took Tylenol and Motrin.  JX-4 at 40.  The family noted that Butler's

foot had a "foul smelling odor." *Id.*  During a physical examination, Butler was observed to be missing multiple toes on her left foot, with an open wound to the metatarsal-phalangeal joint of the third through fifth digits. *Id.*; Tr. at 601:17-602:2.  All the toes on Butler's right foot were present, but Butler had a significant heel ulceration along with what appeared to be dry gangrene of multiple toes on the right foot.  JX-4 at 40; JX-10; Tr. at 602:3-9, 603:11-605:1.  Faint pulses were detected on the dorsalis pedis artery of each foot.  JX-4 at 40.  Her sensory examination was intact to all modalities tested, indicating an absence of neuropathy. *Id.*; Tr. 602:19-20.  Butler's blood pressure was normal and registered at 127/70.  JX-4 at 41.  But her white blood cell count was elevated, and her hemoglobin and hematocrit levels were abnormal. *Id.* at 43.

X-rays were taken of Butler's feet that same day.  JX-4 at 251-52.  The x-ray of her right foot confirmed that her toes were intact but reflected destructive changes in the second digit, with soft tissue swelling and bony erosion indicative of destructive osteomyelitis. *Id.* at 43; Tr. at 606:19-608:25.  There were no destructive changes noted in the first, third, fourth, or fifth digits of her right foot, or in her right heel bone.  JX-4 at 43; Tr. at 606:19-608:25.  The x-ray of her left foot revealed autoamputation of the first through fourth digits.  JX-4 at 252; Tr. at 604:6-606:13.

Butler was thus admitted to the hospital, JX-4 at 60; Tr. at 610:19-21, and was started on an antibiotics, JX-4 at 13.  Vascular, infectious disease, and cardiac consults were ordered.  JX-4 at 13.  The medical admission note documented that Butler

> states that it [right foot pain] started 1 week ago, but family states that it has been going on for several weeks.  Apparently she developed some blisters on the foot, and they broke open and started draining purulent, foul-smelling discharge.  She has only taken [over-the-counter] Tylenol/Advil for symptoms, has not been on any antibiotics. . . .  Per family, 2 years ago, she banged her [left[9]] foot and toes slowly became black and fell off.  She was only treating it with [over-the-counter] cream/ointment.

---

[9] The Court agrees with Dr. Bar-David's testimony that this admission note likely referred to Butler's left foot but incorrectly wrote "R." *See* Tr. at 612:1-4.

JX-4 at 60; *see* Tr. at 611:13-612:6.  The notes indicated that Butler's right foot was deformed with an infected second toe, there was foul-smelling discharge and ulcer at the bottom of foot, and the left foot had multiple toes missing and was also foul-smelling.  JX-4 at 61.

Early the next morning, March 29, 2019, at 5:17 a.m., an addendum was added to the medical admission note: "Add sepsis to problem list.  Patient appears to meet sepsis criteria."  *Id.* at 60.  Notes from a March 29, 2019 cardiac consultation stated that Butler reported that "3 of her toes 'fell off' 2 years ago and her family advocated for her to see a physician over the last several months and finally [she] presented to the Emergency Room yesterday complaining of right foot ulcer with infection."  *Id.* at 46.  The cardiologist recommended an echocardiogram and Lexiscan nuclear stress test to assess the preoperative risk prior to vascular surgery.  *Id.* at 47.  Notes from an infectious disease consult stated that Butler "said her left foot digits 1-4 became black and fell off over the past 2 years," and that "she said she did not have pain because of neuropathy."  *Id.* at 49.  Butler stated during her hospital stay that her toes had fallen off while she was walking around her apartment.  Tr. at 386:22-388:7.  Butler reported that her right foot developed blistering lesions and malodor.  JX-4 at 49.  She did not report experiencing fever and chills.  *Id.*  The infectious disease consultant concluded that Butler had a "secondary infection" and that her right foot would need to be amputated because the consultant "[did] not believe that antibiotics alone will be sufficient in resolving the severe necrotic disease of the foot" and he "[did] not believe this foot is salvageable."  *Id.* at 50; Tr. at 613:22-614:5.  Regarding the left foot, the doctor also noted the prior "auto amputation of left foot digits 1-4" and that Butler "lost digits over the past couple of years due to PVD [*i.e.*, peripheral vascular disease]."  JX-4 at 50.

That same day, Butler had a vascular consultation with Dr. George Piccorelli, the vascular surgeon.  *Id.* at 69; Tr. at 614:17-18.  His notes from that consultation stated: "Left foot missing

multiple toes (auto-amputated), but wounds are clean and granulating.  Righ[t] foot has a large patch of grossly necrotic skin and muscle on the heel with purulent discharge."  JX-4 at 69.  Dr. Piccorelli conducted an excisional debridement procedure at the bedside to remove grossly necrotic tissue, including skin, subcutaneous tissue, necrotic muscle, and fascia.  *Id.*; Tr. at 615:11-616:2.  His notes reflected that the bone was exposed with some purulent soft tissue remaining but was not damaged.  JX-4 at 69; Tr. at 615:11-616:2.  He also noted that Butler "refuse[d] any surgery at this time," preferring to try an antibiotic.  JX-4 at 69; Tr. at 616:5-9.

A medical follow-up note from March 29, 2019, at 2:07 p.m. stated: "left foot digits 1-4 auto-amputated, dark toes.  Right foot necrotic 1st digit, ulceration on plantar aspect, lateral heel with ulceration, fibrinous tissue in wound bed, brown drainage."  JX-4 at 71.  Under neurological examination, the note quoted Butler as stating, "I have a connection up above.  I will be fine."  *Id.* Also that day, the Lexiscan nuclear stress test yielded equivocal results due to excessive gut activity.  *Id.* at 82-83.

On March 31, 2019, cardiology recommended a pre-operative cardiac catheterization due to the equivocal Lexiscan.  *Id.* at 84.  Butler was initially unwilling to consent to the procedure. Tr. at 46:20-24; JX-4 at 84.  A family meeting was arranged for later in the day.  JX-4 at 84.  The note stated: "I have strongly indicated to pt and family that time is of the essence in view of extent of infection to right foot and that delay in planned cares may result in sepsis, and/or death.  Pt states, 'None of you can save me.  You can only help me.  Only God can save.'  Should pt. persist in refusal of recommended care, will consider a psych evaluation."  *Id.*  Later in the day, after a family meeting, Butler agreed to the cardiac catheterization and understood that amputation of her foot may be necessary.  Tr. at 47:1-6, 618:12-13; JX-4 at 80.

On April 1, 2019, Butler underwent non-invasive vascular testing.  JX-4 at 254; Tr. at 624:4-18.  The ankle brachial index ("ABI")[10] of her right posterior tibial artery was 0.70 mmHg, and the ABI of her right dorsalis pedis artery was 0.76 mmHg.  JX-4 at 254.  The ABI of her left posterior tibial artery was 0.50 mmHg and the ABI of her left dorsalis pedis artery was 0.58 mmHg. *Id.*  This test also indicated that blood circulation flow to Butler's left foot was worse than to her right foot.  Tr. at 625:11-21

A cardiac catheterization was performed on April 1, 2019, and showed non-obstructive cardiac arterial disease.  JX-4 at 89.  The plan was for operative debridement of Butler's right foot. *Id.*  On April 2, 2019, Dr. Piccorelli noted: "Pt feels well, right foot with large amount of foul smelling purulent discharge.  The plantar aspect is completely undermined with purulent necrosis, as well as all of the interspaces have gross drainage.  Will need guillotine amputation of this foot. Discussed at length with pt, she agrees." *Id.* at 99.  An April 3, 2019 note from Dr. Piccorelli similarly documented: "large open wound laterally with center granulation tissue. Lateral and medial heel area with foul smelling drainage and bone exposure.  2nd toe with purulent drainage and increased mobility, likely secondary to osteo." *Id.* at 107.  Dr. Piccorelli also noted that William Butler "agrees with plan as he has known that his mother is noncompliant and the foot has been 'smelling' for a long time." *Id.* at 109.

On April 4, 2019, Butler underwent a guillotine amputation of the right foot. *Id.* at 191; Tr. at 620:6-16.  Dr. Piccorelli's operative record noted Butler's "purulent necrosis at the plantar aspect of the right foot" and that "[t]he decision was made for a Guillotine amputation." JX-4 at 191.  After progressing well following the guillotine amputation, Butler underwent a second,

---

[10] An ABI is the ratio of the ankle's blood pressure to the arm's blood pressure, with ratios less than 1.0 showing vascular disease.  Tr. at 177:24-178:5; *see also id.* at 623:9-624:3.  A normal ABI is typically below 1.4 or 1.5. *Id.* at 623:25-624:2.

below-the-knee amputation on her right knee on April 11, 2019.  JX-4 at 152; Tr. at 620:19-621:2.

On April 15, 2019, Dr. Piccorelli noted that Butler was "[f]eel[ing] well generally," that her wound

was "healing well," and that she could be transferred to rehabilitation.  JX-4 at 183.

## F.    Post-Amputation Life

Following her amputation, Butler underwent in-patient rehabilitation at Burke

Rehabilitation Hospital and The Grove at Valhalla Rehabilitation from April to May 2019, and

then at that hospital's Nursing Center from May to July 2019.  *See* JX-2; JX-6.  After that, she

received outpatient physical therapy at SportsCare of America, P.C.  JX-8.  As of the date of trial,

Butler also was receiving primary care treatment at Westmed Medical Group.  JX-9.  This

rehabilitation appears to have been successful, as Butler is living a healthy and independent life,

and is able to ambulate and perform activities of daily living with a leg prosthesis and a cane.  Tr.

at 51:17-52:25, 54:15-23, 58:11-12, 401:15-19, 412:11-12.

## G.    Expert Testimony

Four expert witnesses testified at trial.  Butler called Dr. Vladimir Lokshin.  The

Government called Dr. Peter Goulden, Dr. Alan Roth, and Dr. Tzvi Bar-David.

### 1.    Dr. Vladimir Lokshin

Dr. Lokshin completed medical school in 2015 and then a residency in internal medicine

in 2018.  *Id.* at 159:12-16.  Following a two-year fellowship in diabetes and endocrinology, Dr.

Lokshin has been a practicing attending in endocrinology since June 2020.  *Id*. at 159:17-20.  Dr.

Lokshin is board-certified in internal medicine, diabetes, and endocrinology.  *Id.* at 160:2-4.  Dr.

Lokshin reviewed Butler's medical records from Greenburgh and provided expert testimony  on

the treatment of diabetic patients generally and Butler's treatment in particular.  *Id.* at 160:25-

161:13.

Dr. Lokshin discussed various tests that he believes should be done for diabetic patients. First, he described the A1C test, which measures concentrated hemoglobin and indicates the blood sugar levels.  *Id.* at 161:17-25.  Dr. Lokshin testified that, due to Butler's risk factors, including elevated cholesterol, high blood pressure, and age over 50, her A1C levels should have been tested every three months, or at least until all her comorbidities were under control.  *Id.* at 163:2-19.  He also claimed that the American Diabetes Association ("ADA") recommends measuring creatine at least once a year to assess a person's kidney functions.  *Id.* at 161:25-162:4.  Dr. Lokshin also described the microalbumin test, which can detect early kidney dysfunction by measuring the amount of protein excreted into the urine, and opined that this test should be performed annually. *Id.* at 162:5-8, 163:23-25.  He further emphasized the importance of regularly testing a diabetic patient's blood pressure, explaining that high blood pressure damages vessels and thus increases the risk for atherosclerotic disease, which can lead to peripheral arterial disease.  *Id.* at 164:6-21. Dr. Lokshin also testified that Butler should have had her cholesterol tested every three months or until an appropriate cholesterol level goal was reached.  *Id.* at 167:9-17.  Dr. Loskhin also testified that Butler's diabetes and blood pressure medications should have been evaluated at every visit to ensure that they were causing no harmful side effects.  *Id.* at 168:5-19.  However, Dr. Loskhin acknowledged that he could not say whether it would have been safe to cut off Butler's medications during the period between December 2016 and March 2019 when she did not appear for a clinic visit.  *Id.* at 214:13-24.

Dr. Lokshin additionally offered his opinions on foot care for diabetic patients.  First, he discussed tests to assess loss of protective sensation, or peripheral neuropathy, a condition that approximately fifty percent of diabetic patients will develop.  *Id.* at 168:24-169:15.  These tests include a visual inspection of the foot and assessing pulses on the foot at the dorsalis pedis (top of

the arch) and at the posterior tibialis (behind the ankle). *Id.* at 169:23-171:4. Dr. Lokshin testified that the minimum standard of care is to perform these tests once year. *Id.* at 171:5-8. Dr. Lokshin also discussed the sensory assessment of the foot, which can be performed with either a tuning fork placed next to the big toe to assess receipt of vibration or a pinprick test near the big toenail. *Id.* at 171:11-172:6. Dr. Lokshin also discussed that a filament test can reveal ulcer formation on the foot. *Id.* at 172:7-15. However, he acknowledged that it would be speculative to say whether neuropathy could have been detected if Butler had attended the clinic between December 2016 and March 2019, or specifically when any ulcers or poor foot perfusion could have been diagnosed via a foot examination. *Id.* at 217:8-218:12. In general, Dr. Lokshin was unable to quantify how much time of lack of preventative care would be enough to constitute a substantial contributing factor to amputation, but opined that several years would probably be enough. *Id.* at 191:2-12.

### 2.    Dr. Alan Roth

Dr. Roth is a family physician and Chair of the Department of Family Medicine and Ambulatory Care and Chief of Integrative Pain and Palliative care at the Jamaica Hospital Medical Center and the Flushing Hospital Medical Center. *Id.* at 450:1-7. He obtained a medical degree from the New York Institute of Technology, College of Osteopathic Medicine in 1986. *Id.* at 451:8-12. Dr. Roth then completed a rotating internship at the Coney Island Hospital in Brooklyn, followed by a residency in family medicine at Jamaica Hospital Medical Center, and then fellowships in hospice and palliative medicine and family medicine. *Id.* at 451:13-23. In his current role, Dr. Roth treats patients and supervises residents, medical students, and nurse practitioners. *Id.* at 450:15-21. He is also on the faculty of Albert Einstein College of Medicine and New York Institute of Technology College of Medicine, and has received "top doctor" awards from numerous publications, including *New York Magazine* and *Time Magazine*, as well as multiple teaching awards. *Id.* at 453:8-18. Dr. Roth described his typical patient population as

"essentially . . . the same" as Greenburgh's: "a lot of Medicaid patients, undocumented and uninsured patients," "[p]eople who have . . . less continuity of care," and "transient patients." *Id.* at 455:2-17. Dr. Roth reviewed Butler's medical records from Greenburgh and White Plains Hospital, the deposition testimony from each fact witness, and Dr. Lokshin's expert report. 457:4-12. He was asked to opine on whether Greenburgh met the standard of care in treating Butler. *Id.* at 451:1-3.

Dr. Roth opined that, in treating Butler, Greenburgh "met the standard of care in the care of a patient with hypertension, diabetes and hyperlipidemia." *Id.* at 457:17-18. Specifically, he opined that Greenburgh's practitioners performed "appropriate physical examination[s]" of Butler, "ordered the appropriate testing," and conducted "appropriate medical management, as well as patient and disease education." *Id.* at 457:21-458:4.

Dr. Roth went through notes from each of Butler's visits to Greenburgh and concluded that RNP Lynch and Dr. Davis both met the appropriate standard of care every time. *See id.* at 460:2-5, 465:22-466:16, 474:21-475:16, 476:22-477:16, 477:21-478:15, 478:21-479:1, 482:10-483:19, 484:7-25, 485:24-486:19, 489:2-17, 494:20-23. Starting with Butler's February 3, 2015 visit, Dr. Roth noted that RNP Lynch's notes indicated that a foot examination was performed, *id.* at 460:16-461:3, and that she implemented the proper treatment plan in light of Butler's significantly elevated blood pressure by ordering appropriate labs, prescribing appropriate medications, counseling Butler on diet and exercise, and recommending an immediate follow-up appointment, *id.* at 464:2-465:19. As to the February 6, 2015 visit, Dr. Roth testified that RNP Lynch's notes once again indicated that she performed a foot examination, *id.* at 467:10-18, and that her treatment plan of adding an additional medication and directing a two-week follow up was "reasonable," *id.* at 468:15-25. Dr. Roth expressed similar approval with respect to RNP Lynch's treatment of Butler

during her March 26, 2015 and April 2, 2015 appointments, and noted that Butler's blood pressure appeared to be improving.  *Id.* at 475:11-16, 476:25-477:3.  With respect to the July 14, 2016 appointment, Dr. Roth opined that RNP Lynch ordered the appropriate labs (and that Butler's lab results were improved, likely due to Butler's increased compliance with taking her medications), *id.* at 481:6-483:4, and that RNP Lynch made the right decision to start Butler on Simvastatin, *id.* at 478:24-479:1.  In particular, Dr. Roth explained that RNP Lynch prescribed Butler a reasonable dose of that medication, and disagreed with Dr. Lokshin's view that RNP Lynch should have prescribed a higher dose of 20 mg.  *Id.* at 479:7-480:25.  Regarding the August 15, 2016 visit, Dr. Roth noted that it was reasonable for RNP Lynch to change Butler's medications and to prescribe Amlodipine given that her blood pressure remained elevated.  *Id.* at 482:10-483:3.  Dr. Roth also approved the treatment plan RNP Lynch implemented at the October 3, 2016 visit, commending her for talking to Butler about her sodium intake, which is "essential to controlling diabetes," *id.* at 484:14-20, and for ordering ambulatory blood pressure monitoring (*i.e.*, an at-home blood pressure machine), which, according to Dr. Roth, is becoming increasingly standard, *id.* at 485:8-19.  With respect to Butler's November 3, 2016 visit, Dr. Roth opined that RNP Lynch was responsible for Butler's improved lab results.  *Id.* at 488:20-24.  He noted that Butler's blood pressure was significantly decreased, perhaps due to the at-home monitoring or better compliance with her medications, *id.* at 486:8-11, that her cholesterol levels were generally improving, *id.* at 486:3-487:19, and that her A1C was slightly elevated but still within the well-controlled range for a diabetic, *id.* at 488:14-16.  Finally, Dr. Roth opined that Dr. Davis also met the appropriate standard of care in treating Butler at her March 28, 2019 visit, by examining her right foot only, given that Butler expressed no complaints about her left foot, and by having her transported to the hospital for a comprehensive assessment.  *Id.* at 494:14-495:12.

Overall, Dr. Roth concluded that RNP Lynch, as a registered nurse practitioner, was qualified to treat Butler without oversight from Dr. Davis. *Id.* at 490:22-491:6. He also testified that as a licensed practical nurse herself, Butler would have been "fully trained" and familiar with each of the medical techniques and treatments used in her care. *Id.* at 489:24-490:9. Moreover, at a more basic level, Butler would have been fully competent to perceive her deteriorating feet—even with significant cataracts. *Id.* at 495:14-496:3. He also noted that with patients like Butler, past noncompliance can be indicative of future noncompliance. *Id.* at 555:3-9.

Finally, Dr. Roth disagreed with several opinions offered by Dr. Lokshin. Dr. Roth testified that RNP Lynch properly recorded her foot examinations of Butler in her notes, explaining that those notes reflected that RNP Lynch looked at Butler's feet and performed an appropriate examination during each visit, *e.g.*, *id.* at 460:16-61:3, 462:11-16, 468:6-10, even though Butler never once complained about her feet, *id.* at 493:8-14. Dr. Roth further opined that RNP Lynch's decisions not to conduct a peripheral vascular disease arterial test, not to refer Butler to a vascular specialist, not to perform an ankle-brachial index test, and to examine Butler's feet without the use of a monofilament or tuning fork did not violate the standard of care. *Id.* at 462:17-25, 491:20-492:15, 493:15-22, 550:16-18, 556:1-15. In further contrast to Dr. Lokshin, Dr. Roth testified that RNP Lynch ordered the appropriate labs for Butler at every visit, *id.* at 491:13-19, and that she could not have been expected to perform lab tests on Butler if Butler failed to appear for her appointments, *id.* at 551:1-18. He also testified that the standard of care does not require a nurse to bring a patient's cholesterol down to 70 or 80. *Id.* at 487:25-488:13. Dr. Roth further concluded that RNP Lynch acted within the standard of care in prescribing medication to Butler during the December 2016 through March 28, 2019 period when Butler failed to appear for an appointment. *Id.* at 496:7-498:3, 552:25-553:11. In addition, Dr. Roth testified that the standard of care,

particularly with respect to the Patient-Centered Medical Home ("PCMH") model, *see id.* at 472:25-473:15, does not require health centers to reach out to patients who fail to schedule appointments because it would be impossible for those hospitals to track all noncompliant patients. *Id.* at 471:20-472:11, 473:16-474:16.  While hospitals typically send letters to patients who fail to appear for a previously scheduled appointments, no hospital can force a patient to make the follow-up appointment in the first place.  *Id.* at 471:4-19.

### 3.   Dr. Peter Goulden

Dr. Goulden is an endocrinologist specializing in diabetes and general internal medicine since 2006.  *Id.* at 559:6, 560:7-8, 560:22.  He received his medical degree from the University of Edinburgh in 1995.  *Id.* at 559:17-22.  He then completed an 11.5-year apprenticeship at the University of Edinburgh Medical School Royal Infirmary, *id.* at 559:23-560:1, followed by a six-year clinical and research fellowship in London, *id.* at 560:2-6.  He is board-certified in endocrinology, diabetes, metabolism, and general internal medicine, and licensed to practice endocrinology in New York and New Jersey.  *Id.* at 560:13-20.  He is currently a faculty member and Division Chief of Endocrinology at Mount Sinai Icahn School of Medicine, where he spends 70% of his time in a clinical capacity "teaching residents, fellows, [and] medical students."  *Id.* at 561:4-25.  Dr. Goulden also is a member of numerous professional societies, including the ADA, and has been published and peer reviewed.  *Id.* at 563:6-25.

Dr. Goulden was retained by the Government as an expert in the field of endocrinology to opine on whether Greenburgh met the standard of care in its treatment of Butler as well as the extent to which Butler contributed to her own injuries.  *Id.* at 559:11-13, 564:25-565:1.  In arriving at his expert conclusions, Dr. Goulden reviewed the medical records, deposition testimony, and the other expert reports.  *Id.* at 565:6-9.  Dr. Goulden concluded that Greenburgh met "the standard of care in regard to their management of Ms. Butler, and also with regard to Ms. Butler,

unfortunately there was some contribution to her own condition in her foot complication." *Id.* at 565:12-19. In particular, Dr. Goulden opined that RNP Lynch met the standard of care with respect to treating Butler's diabetes, her blood pressure, her cholesterol, *id.* at 565:20-566:3, and during the period of December 2016 through March 2019, including her March 28, 2019 appointment, *id.* at 575:22-577:23.

Regarding Butler's diabetes care, Dr. Goulden testified that RNP Lynch helped Butler achieve good glucose control, as measured by her A1C levels, during the period of February 2015 to March 2019. *Id.* at 566:6-13, 572:10-17. Dr. Goulden noted that the ADA sets a target of A1C level of less than 7% as a "benchmark" for good glucose control. *Id.* at 566:22-25. RNP Lynch helped Butler achieve this goal by educating Butler about diabetes care and by prescribing Butler a 2000 mg daily dose of Metformin. *Id.* at 567:1-8. Indeed, Butler's A1C levels dropped from 7.3% in February 2015 to 6.5% in August 2016, which, according to Dr. Goulden, "is consistent with excellent glucose control" and "well below the ADA target." *Id.* at 569:5-16. He noted that this sort of decrease "can have a significant [e]ffect on reducing the risk of amputation due to peripheral vascular disease," *id.* at 570:1-11, and while Butler's A1C slightly increased to 6.9% in November 2016, *id.* at 569:17-21, "it's common to see fluctuations in A1C in this smaller magnitude," which are usually caused by changes in diet or exercise or reduced adherence to medication, *id.* at 570:14-17. In fact, according to Dr. Goulden, Butler's glucose levels were still "consistent with good control" when Butler returned to Greenburgh in March 2019, as measured by both her A1C level and her Glucoscan reading. *Id.* at 570:23-572:7. In addition, Dr. Goulden testified that RNP Lynch helped Butler achieve good glucose control by testing her A1C levels every three to six months during the periods when Butler regularly attended her clinical appointments, and that the standard of care did not require RNP Lynch to test Butler's A1C when

she did not show up for appointments, as doing so would have been "impossible." *Id.* at 567:10-568:14.

Dr. Goulden further testified that in addition to helping Butler achieve good glucose control, RNP Lynch met the standard of care with respect to her treatment of Butler's diabetes in other ways. First, RNP Lynch properly educated Butler regarding her diabetes and foot care. *Id.* at 566:14-16. Like Dr. Roth, Dr. Goulden testified that such education was evident based on RNP Lynch's medical records from Butler's visits. *Id.* at 572:21-24. Second, RNP Lynch performed a comprehensive foot examination on Butler at every visit, which, according to Dr. Goulden, actually goes "above the standard of care." *Id.* at 572:20-573:1. Dr. Goulden further opined that the standard of care would not have required RNP Lynch to refer Butler to a podiatrist because the foot examinations she performed on Butler were sufficient. *Id.* at 573:8-13. Nor did RNP Lynch need to use a monofilament or tuning fork to test for neuropathy. *Id.* at 573:14-19. Third, Dr. Goulden determined that RNP Lynch also acted within the standard of care for Butler's diabetes treatment by referring her to an ophthalmologist for her eyes. *Id.* at 573:20-24.

Dr. Goulden also concluded that RNP Lynch met the standard of care with respect to her care of Butler's blood pressure and cholesterol. *Id.* at 566:1-3. Dr. Goulden testified that the ADA recommends a blood pressure below 140/90 for diabetics. *Id.* at 565:4. According to Dr. Goulden, RNP Lynch acted within the standard of care by prescribing Butler blood pressure lowering medications, such as Clonidine and Amlodipine, and by counseling Butler on the importance of taking those medications. *Id.* at 575:9-21. Similarly, Dr. Goulden concluded that RNP Lynch met the standard of care in her treatment of Butler's cholesterol by prescribing Simvastatin at a dose of 10 mg, which Dr. Goulden opined was appropriate based on the ADA standards at the time. *Id.* at 575:18-21.

Finally, Dr. Goulden opined that RNP Lynch met the standard of care during the period of December 2016 through March 2019 by continuing to prescribe Butler medications, even though Butler failed to schedule clinical appointments. *Id.* at 575:22-576:12. Indeed, Dr. Goulden testified that an abrupt discontinuance of those medications could be "dangerous" and could lead to an "increased risk of stroke, . . . increased risk of kidney disease, eye disease, . . . heart attack," and/or "hypoglycemic emergency." *Id.* at 576:2-12. Moreover, Dr. Goulden opined that while true creatine levels should hypothetically be checked once per year under the ADA guidelines, RNP Lynch adhered to this standard by checking them once in 2015 and again in 2016 (when it was within the normal range), and that it would not have been possible for RNP Lynch to check Butler's creatine levels when she was absent from clinic. *Id.* at 576:13-577:2. Nor did Dr. Goulden believe that the standard of care required RNP Lynch to check Butler's A1C levels or to perform foot examinations during this period since, again, doing so would have been impossible with the patient absent from clinic. *Id.* at 577:3-7. Rather, Dr. Goulden explained that the patient has the responsibility to schedule her own appointments, and a medical provider cannot compel a patient to do so. *Id.* at 577:10-14.

Finally, Dr. Goulden opined that Dr. Davis too adhered to the standard of care when he met with Butler on March 28, 2019 by "promptly" recognizing that Butler's foot required attention and by arranging to immediately transfer her to the emergency room at White Plains Hospital. *Id.* at 577:20-23.

Turning to causation, Dr. Goulden opined that Butler's injuries were caused by Butler "not showing up for appointments" during the period of December 2016 to March 2019, and by Butler "not taking action" with respect to her foot. *Id.* at 579:1-5. Indeed, Dr. Goulden testified that even if Butler had merely made her family aware of her situation, this could have helped as her family

28

"would have done everything in their power to get her help."  *Id.*  Moreover, Dr. Goulden noted that Butler's eye problems did not contribute to Butler's delay in seeking treatment because she still would have been able to see her toes fall off on her left foot, and feel and smell the ulceration in her right leg.  *Id.* at 574:10-22.

### 4.    Dr. Tzvi Bar-David

Dr. Bar-David is a practicing podiatrist.  *Id.* at 587:11.  He graduated from New York College of Podiatric Medicine in 1989, and completed a residency in 1991.  *Id.* at 588:2-3.  He has worked for the past thirty-two years in private practice and is currently affiliated with New York-Presbyterian/Columbia University Irving Medical Center, where he is the Director of Podiatric Surgery Service.  *Id.* at 588-6, 589:12-25.  Dr. Bar-David testified that in his practice, approximately 25% of his patients have diabetic foot conditions.  *Id.* at 590:12.  He performs roughly 150 foot surgeries per year, has performed several hundred amputations throughout his career, and works closely with vascular surgeons on below-the-knee amputations.  *Id.* at 590:21-591:9.  He is a member of the New York State Podiatric Medical Association, the American Podiatric Medical Association, and the American College of Foot and Ankle Surgeons, and has been published and peer reviewed.  *Id.* 591:12-20.

In preparation for his testimony, Dr. Bar-David reviewed the full medical record in this case from both Greenburgh and White Plains Hospital, as well as the deposition testimony of Butler, her family members, and Dr. Lokshin.  *Id.* at 592:17-21.  He was retained to opine on (1) whether Greenburgh breached the standard of care in treating Butler; (2) whether Greenburgh caused Butler's amputation; and (3) Butler's post-amputation prognosis.  *Id.* at 587:16-21.

As to his first opinion, Dr. Bar-David concluded that Greenburgh and its providers adhered to the standard of care in their treatment of Butler.  *Id.* at 593:1-4.  He noted that Butler maintained good glucose control while under Greenburgh's care.  *Id.* at 593:21-22.  According to Dr. Bar-

David, it is also clear from RNP Lynch's notes that she administered proper foot care to Butler during each visit, including by examining Butler's feet, *id.* at 593:22-594:1, and by educating Butler on diet and exercise, *id.* at 594:4-595:2. Dr. Bar-David further testified that RNP Lynch properly documented her foot examinations of Butler in her notes, *id.* at 594:8-17, and that RNP Lynch did not need to refer Butler to a podiatrist or use a monofilament or tuning fork in her examinations, *id.* at 593:3-596:12. Dr. Bar-David additionally concluded that RNP Lynch acted within the standard of care when she continued prescribing medications to Butler during the period between December 2016 and March 2019 when Butler did not show up to Greenburgh. *Id.* at 596:18-23. Finally, according to Dr. Bar-David, Dr. Davis also adhered to the standard of care by immediately assessing Butler's right foot condition as a medical emergency and appropriately referring Butler to White Plains Hospital. *Id.* at 596:24-597:4.

As to his second opinion, Dr. Bar-David concluded that the treatment provided by Greenburgh and its providers was not the cause of Butler's amputation. *Id.* at 593:5-7. Rather, Dr. Bar-David concluded, "Ms. Butler had a severe necrotizing skin infection. That was the reason she had her leg amputated." *Id.* at 597:8-9. Dr. Bar-David elaborated that a necrotizing skin infection is caused by a combination of anaerobic and aerobic bacteria surviving without oxygen deep under the skin that eat and necrose healthy skin tissue to the point of liquidation leading to no sustainable tissue left. *Id.* at 597:22-598:13. Necrotizing skin infections are aggressive and can become life-threatening within days. *Id.* at 599:3-13. As Dr. Bar-David explained,

> because they cause severe necrosis, in order to prevent death, because they are [at] many times a medical emergency, they can cause sepsis and other types of systemic issues, . . . what you need to do is . . . to aggressively debride, meaning you take out as much as you can, all of that dead tissue, and you have to stop the infection from progressing further and open up all the tissue planes in order to appropriately stop the infection from proceeding further, with of course antibiotics as well, but the surgical part of it is critical.

*Id.* at 598:16-25.

30

In Butler's case, Dr. Bar-David testified that numerous medical records from White Plains Hospital demonstrate that Butler's necrotizing skin infection on her right heel caused the need for the amputation of her right foot.  *Id.* at 599:14-17, 602:21-24, 615:3-10, 617:4-15, 618:15-25, 626:11-24; *see* JX-4 at 40, 43, 50, 61, 69, 71, 99.  According to Dr. Bar-David, Butler's medical records further demonstrate that the infection was acute, developing over the course of no more than several weeks.  Tr. at 609:3-24, 612:13-19, 616:3-5; *see* JX-4 at 60.  Because Butler's infection developed so quickly, like most necrotizing skin infections, "there is no way" more frequent visits to or foot examinations at Greenburgh could have prevented the condition.  Tr. at 621:12-25.  Nor would antibiotics have been sufficient, according to Dr. Bar-David.  *Id.* at 614:6-13.  Instead, Butler needed a guillotine amputation to prevent sepsis from harming her and possibly killing her.  *Id.* at 619:10-12.  Thus, as Dr. Bar-David put it, "when a necrotizing skin infection . . . destroy[s] the entire heel tissue, as it did in Ms. Butler's case, there's no way to salvage the leg . . . . And that was the reason she had a [below-the-knee] amputation.  It was because of the location, the severity of the infection that she had, and the acuity, the acuteness of that infection was the cause of it."  *Id.* at 597:11-19; se*e also id.* at 628:9-14 ("Again, as I stated before, [Butler] had a clear acute necrotizing infection.  This was the cause of her below-the-knee amputation.  It was the severity, the acuity, and the presence of this infection at that site of the heel that was the reason she developed or needed to have the below-the-knee amputation.").

Dr. Bar-David also explained that neuropathy, by contrast, does not cause amputations.  *Id.* at 622:1-8.  And even if it did, Butler's physical examination at White Plains Hospital did not indicate any neuropathy in her right foot.[11]  *Id.* at 602:17-20.  Nor was there any evidence,

_____

[11] While Butler's medical records from White Plains Hospital do indicate significant vascular disease in her left foot, *e.g.*, Tr. at 625:22-626:4; JX-4 at 254, those records also make

31

according to Dr. Bar-David, that peripheral vascular or arterial disease, or osteomyelitis in the forefoot[12] second metatarsal, caused or contributed to Butler's amputation.  *Id.* at 627:5-22.

Finally, Dr. Bar-David's third opinion was that Butler should be able to maintain an independent, healthy lifestyle going forward.  *Id.* at 593:8-12.  His prognosis was based on his review of Butler's "rehabilitation notes, and [the fact that] she was fitted for a prosthesis and she seems to be able to be independent."  *Id.* at 628:17-21.

## IV.  Conclusions of Law

### A.    Jurisdiction and Venue

This Court has jurisdiction over this action pursuant to the FTCA, which provides that federal district courts

> shall have exclusive jurisdiction of civil actions on claims against the United States . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  Thus, under the FTCA, district courts have "jurisdiction over tort suits against the United States for 'the negligent acts of federal employees acting in the scope of their employment.'"  *Corley v. United States*, 11 F.4th 79, 84 (2d Cir. 2021) (quoting *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020)).  Liability under the FTCA extends to claims of "medical malpractice, committed by federal employees."  *Lettman v. United States*, No. 12 Civ. 6696 (LGS),

---

clear that she had been experiencing problems with that foot for several years but had not sought medical attention, Tr. at 600:18-602:2, 613:13-19; JX-4 at 40, 49.  However, because her left toes autoamputated at some point during the period when she was not attending medical appointments at Greenburgh, her left foot was able to survive.  Tr. at 626:7-10.  And regardless, as Dr. Bar-David testified, it would be speculative to say whether more frequent visits to Greenburgh would have resulted in the diagnosis of the vascular disease.  *Id.* at 628:1-6.

[12] Indeed, as Dr. Bar-David noted, Butler's x-ray, Dr. Piccorelli's bedside debridement, and her infections disease consult all focused on her heel without indicating anything with respect to the right forefoot.  Tr. at 627:11-22.

2013 WL 4618301, at *3 (S.D.N.Y. Aug. 29, 2013) (citing *Taylor v. United States*, 121 F.3d 86, 89 (2d Cir. 1997); 28 U.S.C. § 1346)); *accord Williams v. United States*, No. 03 Civ. 9909 (GEL), 2007 WL 951382, at *3 (S.D.N.Y. Mar. 22, 2007).

Venue is proper in the Southern District of New York because a substantial part of the events giving rise to Butler's claim occurred in Westchester, New York, which is part of this District. *See* 28 U.S.C. § 1391.

## B.   Legal Standards

The FTCA's "reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA." *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994). Thus, New York law provides the substantive law to apply in this case. *See Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). Under New York law, a plaintiff alleging medical malpractice must prove "that the doctor deviated from acceptable medical practice, and that such deviation was a proximate cause of the plaintiff's injury." *James v. Wormuth*, 21 N.Y.3d 540, 545 (2013); *accord Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994); *Gonzalez v. United States*, 612 F. Supp. 3d 336, 345 (S.D.N.Y. Mar. 31, 2020), *aff'd*, No. 21-548-cv, 2023 WL 5437562 (2d Cir. Aug. 24, 2023). The plaintiff bears the burden of proving those elements by a preponderance of the evidence. *Gonzalez*, 612 F. Supp. 3d at 345 (citing *Metzen v. United States*, 19 F.3d 785, 807 (2d Cir. 1994)). Expert testimony is necessary "to make out these elements, 'except as to matters within the ordinary experience and knowledge of laymen.'" *Id.* (quoting *Milano v. Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995)); *accord Dentes v. Mauser*, 937 N.Y.S.2d 409, 411 (3d Dep't 2012). "The requirement that the plaintiff introduce expert medical testimony is imposed in part because without expert assistance [the factfinder] will often have no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine." *Marin*

*v. United States*, No. 06 Civ. 552 (SHS), 2008 WL 11395570, at *13 (S.D.N.Y. May 29, 2008) (internal quotation marks omitted) (quoting *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987)).  A medical malpractice claim cannot be based on speculation and must be supported by competent evidence.  *See Peluso v. C.R. Bard, Inc.*, 1 N.Y.S.3d 500, 502-04 (3d Dep't 2015).  And proximate causation in medical malpractice cases requires "sufficient medical evidence from which a reasonable person might conclude that it was more probable than not that the defendant's departure was a substantial factor in causing the plaintiff's injury."  *Berger v. Shen*, 126 N.Y.S.3d 720, 723 (2d Dep't 2020) (internal quotation marks omitted).

Like the question of liability, "[d]amages in FTCA actions are determined by the law of the state in which the tort occurred."  *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1081-82 (2d Cir. 1988); *accord Gonzalez*, 612 F. Supp. 3d at 348.  "Generally, under New York law a plaintiff may recover his loss of earnings, medical expenses, and mental and physical pain and suffering."  *Ulrich*, 853 F.2d at 1082; *accord Gonzalez*, 612 F. Supp. 3d at 348.

## C.    Analysis

Butler has not established any deviation from the standard of care by Greenburgh or by any provider there.  Rather, the testimony established that, at all turns, medical providers at Greenburgh met the standard of care in treating Butler.  Butler also has not established causation.

### 1.    Standard of Care

As noted above, "[t]o establish a claim for medical malpractice against the United States, [Butler] must prove that [Greenburgh] departed from the standard of care in the community."  *Hersko v. United States*, No. 13 Civ. 3255 (JLC), 2017 WL 1957272, at *5 (S.D.N.Y. May 11, 2017) (citing *Arkin*, 32 F.3d at 664).  Under New York law, the general standard of care for physicians and nurses is well established: the medical provider must "exercise 'that reasonable degree of learning and skill that is ordinarily possessed by [practitioners] in the locality where he

34

practices.'" *Perez v. United States*, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999) (quoting *Pike v. Honsinger*, 49 N.E. 760, 762 (N.Y. 1898)); *accord Kawache v. United States*, No. 08 Civ. 3128 (KAM) (SMG), 2011 WL 441684, at *14 (E.D.N.Y. Feb. 7, 2011); *LaMarca v. United States*, 31 F. Supp. 2d 110, 121 (E.D.N.Y. 1998) (applying the same medical malpractice standard to nurses). Thus, a practitioner will be "liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment." *Perez*, 85 F. Supp. 2d at 226 (quoting *Pike*, 49 N.E. at 762).

As explained below, Butler has failed to prove by a preponderance of the evidence any deviation from the standard of care by Greenburgh or its providers. The Government presented testimony at trial from three highly qualified experts in fields that involve treating diabetic patients: (1) Dr. Alan Roth, who has practiced in the area of family medicine since 1987; (2) Dr. Peter Goulden, a board-certified physician in endocrinology with over fifteen years of clinical experience in treating diabetic patients with an array of problems, including foot complications; and (3) Dr. Tzvi Bar-David, a podiatrist who is board-certified in the field of foot and ankle surgery with over thirty years of clinical experience treating diabetic patients with an array of problems, including neuropathy, vascular disease, and limb-threatening foot infections.[13] *See supra* III.G.2-4. Like these experts, the Court concludes that Greenburgh, RNP Lynch, Dr. Davis, and any other medical providers at Greenburgh provided care that satisfied the standards of care and skill of the average medical practitioner in fields that involve treating diabetic patients. Tr. at 457:17-18, 565:12-19, 593:1-4.

---

[13] These witnesses brought significantly greater experience and expertise in the relevant area than Butler's expert, Dr. Lokshin, who had been a practicing endocrinologist for only approximately two years at the time of his trial testimony. Tr. at 159:17-20. Dr. Lokshin also acknowledged that he does not personally treat or have expertise in peripheral artery disease, vascular disease, neuropathy, gangrene, necrotizing infection, or amputation. *Id.* at 222:22-230:1.

To begin, the Court agrees with Dr. Roth's opinion that RNP Lynch was qualified to treat Butler without any oversight from a doctor. *Id.* at 490:22-491:6.  The Court further finds that RNP Lynch adhered to the standard of care when treating Butler during Butler's appointments at Greenburgh.  As Dr. Roth concluded, RNP Lynch's notes from each instance she treated Butler demonstrate that RNP Lynch met the standard of care during each of those visits.  *See id.* at 460:2-5, 465:22-466:16, 474:21-475:16, 476:22-477:16, 477:21-478:15, 478:21-479:1, 482:10-483:19, 484:7-25, 485:24-486:19, 489:2-17, 494:20-23.  In particular, RNP Lynch appropriately counseled and educated Butler on diabetes, foot care, and other treatment during Butler's visits to Greenburgh in 2015 and 2016 and documented that education in her notes.  *E.g.*, JX-1 at 17-18, 23, 29-30, 34-35, 40, 44-45, 52, 59, 69, 74; Tr. 244:7-8 (RNP Lynch testifying that "[e]ducation is always given to the patient at the end of their visit and throughout the visit"); *see supra* fn. 6.  Based on its review of these medical records and the testimony at trial, the Court agrees with Dr. Roth's expert conclusion that this education and instruction on diabetes and foot care was appropriate and met the standard of care.  *See* Tr. at 464:12-465:19, 477:6-12, 484:14-20.  These views were largely shared by Dr. Goulden and Dr. Bar-David.  Dr. Goulden testified that RNP Lynch educated Butler on her diabetes and foot care at every visit.  *Id.* at 572:21-23.   And Dr. Bar-David testified that RNP Lynch adhered to the standard of care by educating Butler on diet and exercise.  *Id.* 594:4-8, 594:18-595:2.  Thus, the Court finds that RNP Lynch met the standard of care by counseling and educating Butler on diabetes and foot care at her visits to Greenburgh.

RNP Lynch also ordered appropriate tests for Butler, including A1C, lipid panel, and blood tests.  *See, e.g.*, JX-1 at 3-8, 23, 26-27, 45, 48-49, 59, 62, 74, 76-77, 80-81; *see also* Tr. at 464:12-465:19, 469:4-470:3, 478:21-24, 486:23-488:24, 491:13-19, 566:6-13, 567:10-568:14, 572:10-17 (expert testimony that RNP Lynch ordered the appropriate labs).  During every visit, RNP Lynch

performed proper diabetic foot examinations, which entailed RNP Lynch "check[ing] the pulses, . . . capillary refill . . . [whether] there's any crack, there's any opening, any blister, any wound[,] . . . discoloration, . . . reflexes[,] . . . [and] for edema." Tr. at 242:8-243:52; *see id.* at 256:25-257:1, 257:12 (testifying that such foot examinations were part of her routine for every patient).[14]  The Court finds—as did each of the Government's trial experts—that RNP Lynch's foot examinatios of Butler adhered to the standard of care.  *See id.* at 460:16-61:3, 467:10-68:10, 495:1-4, 566:16-17, 593:22-595:2.  In these circumstances, RNP Lynch did not need to refer Butler to a podiatrist, *see id.* at 573:6-13, 594:24-596:12, or a vascular specialist, *see id.* at 492:5-15; RNP Lynch did not need to conduct a peripheral vascular disease arterial test, *see id.* at 491:20-492:4, 556:1-15, or an ankle-brachial index test, *see id.* at 493:14-22; and RNP Lynch did not need to use a monofilament or tuning fork to test for neuropathy, *see id.* at 462:17-25, 550:16-18, 573:14-19, 595:3-23.[15]  In fact, RNP Lynch's routine foot examinations exceeded the standard of care according to Dr. Goulden.  *Id.* at 572:20-573:1.

The Court also agrees with Dr. Goulden and concludes that RNP Lynch further adhered to the standard of care in helping Butler control her glucose levels, as evidenced by Butler's A1C level measurements at below and around the 7% ADA target.  *Id.* at 566:6-13, 572:10-17; *see* JX-1 at 7-8; *see* Tr. at 566:22-25, 569:5-570:17.  The Court credits Dr. Goulden's testimony that these results were achieved with Metformin medication and education on lifestyle.  Tr. at 567:1-8.  RNP

---

[14] Again, while Butler disputes whether these foot examinations were actually performed, Tr. at 729:2-730:8, the Court concludes that they occurred based on RNP Lynch's testimony and the documentation in her notes.  *See supra* fn. 5.

[15] To the extent Butler suggests any deviation from the standard of care with respect to treatment for her eyes, the record makes clear that RNP Lynch took appropriate steps to address the issue by referring Butler to an ophthalmologist and the record further suggests that Butler may not have followed through with her eye treatment.  Tr. at 71:18-74:10; JX-7 at 29.  But regardless, as Dr. Goulden testified, any vision problems that Butler encountered did not contribute to her foot condition or cause delay in Butler seeking treatment for it.  Tr. at 574:10-22.

Lynch also appropriately tested Butler's A1C levels whenever it was feasible, *i.e.*, those occasions when Butler in fact attended her appointments at Greenburgh.  JX-1 at 26, 49, 77; *see also* Tr. at 567:10-568:14.

The Court further agrees with Dr. Goulden that RNP Lynch also adhered to the standard of care in Butler's blood pressure management.  Tr. at 566:1-2, 574:23-575:14.  When Butler first started seeing RNP Lynch, her blood pressure was significantly elevated.  JX-1 at 58, 68, 72; Tr. at 464:2-8, 466:9-10.  RNP Lynch advised Butler of the importance of taking her medications regularly and at the same time every day.  JX-1 at 57, 67, 71; Tr. at 465:12-19, 466:14-16, 575:13-14.  However, Butler admitted to noncompliance in taking her blood pressure medications. JX-1 at 57, 67, 69, 71; *see also, e.g.*, Tr. at 459:12-14, 466:13-14, 468:15-17, 475:4-5.  RNP Lynch took additional measures to help Butler attain lower blood pressure, such as ordering ambulatory blood pressure monitoring and prescribing her Clonidine and Amlodipine.  JX-1 at 16, 21, 28, 30, 33, 38, 40, 43, 45, 50, 55, 57, 65; *see also* Tr. at 575:5-14.  As Dr. Roth noted, Butler's blood pressure improved when she was compliant with her medications and home-monitoring as instructed by RNP Lynch.  Tr. at 477:14-16, 485:8-11; *see also* JX-1 at 30, 43.

The Court further additionally with Dr. Goulden that RNP Lynch adhered to the standard of care in managing Butler's cholesterol.  *See* Tr. at 566:1-3.  Again, as Dr. Roth testified, when Butler first started seeing RNP Lynch, her cholesterol was "significantly elevated."  *Id.* at 469:4-9 (discussing JX-1 at 3).  RNP Lynch prescribed Butler cholesterol medication, Simvastatin, at a dose consistent with the ADA standards at the time.  JX-1 at 16, 28, 38, 45; Tr. at 575:18-21.  Indeed, Dr. Roth testified that statin therapy should be adjusted based on an individual patient's response, including side effects, tolerability, and LDL cholesterol levels.  Tr. at 479:7-480:25.  Butler's cholesterol significantly improved with the dose RNP Lynch prescribed.  JX-1 at 6-8; Tr.

at 481:12-482:4, 486:21-487:3, 488:17-24.[16]  RNP Lynch also counseled Butler on an appropriate

diet to control lipids and on exercise to improve her HDL and overall health.  JX-1 at 21-23; *see*

*also* Tr. at 486:16-19.

The Court also agrees with each of the Government's experts, who testified that RNP

Lynch continued adhering to the standard of care during the period between December 2016 and

March 2019 when Butler did not show up to Greenburgh by continuing to refill Butler's

medications.  *See* Tr. at 496:7-498:3, 442:25-453:11, 576:2-12, 596:18-23.  Indeed, as Dr. Goulden

opined, to abruptly stop medicines in a patient with diabetes and hypertension who is noncompliant

with follow-up can result in dangerous health consequences, including acute hyperglycemic

emergency.  *Id.* at 576:2-12.  While Butler does not dispute this, *id.* at 732:23-24, she argues that

RNP Lynch violated the standard of care by refilling her prescriptions without "conscious thought"

or "exercis[ing] clinical judgment," *id.* at 727:20-25.  But the record does not support this.  Rather,

RNP Lynch testified that for each refill request, she would access the hospital computer system

and pull up the patient's chart, photograph, and identifying information before writing a new

prescription.  *Id.* at 273:11-274:17, 318:2-12.  RNP Lynch testified that she spends approximately

one hour each week doing this.  *Id.* at 273:14.  In Butler's case, RNP Lynch used her clinical

judgment to determine that the benefits of Butler staying on her medication despite failing to

appear for an appointment outweighed any risks.  *Id.* at 318:13-319:12.  To the extent that RNP

Lynch did not determine when Butler had last been to the clinic and did not follow up with Butler

to require her return to the clinic for an appointment before refilling her medications, this is

understandable given the volume of patients the clinic was treating and the level of non-adherence

---

[16] Furthermore, as Dr. Roth testified, while the optimal goal under the ADA guideline is a cholesterol level of 70, the standard of care does not require a nurse to bring a patient like Butler to a cholesterol level of 70 or 80.  Tr. at 487:4-488:13.

by the patient population of the clinic. *Id.* at 101:8-10, 111:5-7, 277:15-20, 284:18-22; *see also id.* at 111:13-18 (Dr. Davis describing Greenburgh's patient population as "lower education level," "migratory, frequently moving," and possessing "language barriers," all of which may pose inevitable "road blocks to healthcare").

Butler also argues that RNP Lynch and Greenburgh deviated from the standard of care by failing to reach out to her to schedule a follow-up appointment. *Id.* at 731:18-732:1. Not so. As Drs. Roth and Goulden testified, the standard of care does not require this; it was Butler's responsibility to schedule and attend medical appointments. *See id.* at 471:9-472:11, 473:16-474:16, 577:10-14. This of course makes sense. A medical provider cannot be expected to somehow coerce a patient who is neglecting their own medical care to actually present at the medical facility. And certainly the medical provider should not be faulted when the patient refuses to schedule or attend medical appointments. *See, e.g.*, *Viera v. United States*, No. 18 Civ. 9270 (KHP), 2020 WL 5879035, at *9 (S.D.N.Y. Oct. 1, 2020) ("Courts in this Circuit have faulted plaintiffs for failing to schedule appointments at the advice of their medical providers when those failures have contributed to the ultimate injury."); *Williams v. Montefiore Med. Ctr.*, No. 28929/02, 2011 WL 11528407, at *3 (N.Y. Sup. Ct. Oct. 24, 2011) ("[T]here is no medical . . . standard of care requiring physicians or hospitals who have identified areas of concern requiring follow-up, and who have advised patients of such concerns to actually chase the patient to make certain that the patient appears for blood tests, attends procedures that were scheduled, or returns to the medical clinics as instructed."). RNP Lynch advised Butler to schedule a follow-up appointment, but Butler failed to do so.[17] Tr. at 62:21-24, 269:12-16. The standard of care does not require health

---

[17] As a former nurse, Butler certainly should have been aware of the importance of scheduling an appointment after a provider directed her to do so, as well as to attend scheduled appointments. Tr. at 578:11-22.

centers to take any further steps such as making phone calls to patients who do not schedule appointments, as it would be unrealistic to expect those medical providers to track all noncompliant patients. *Id.* at 471:20-472:11, 473:16-474:16. While a hospital typically sends a letter to a patient who fails to appear for an appointment, as Greenburgh in fact did on February 7, 2015 when Butler failed to appear for a scheduled appointment, JX-1 at 66, a hospital cannot be expected to force a patient to make the follow-up appointment in the first place. Tr. at 471:4-19; *see also id.* at 577:10-14 (Dr. Goulden testifying that a hospital cannot compel patients to schedule appointments). Similarly, Greenburgh did not deviate from the standard of care by failing to perform foot examinations on Butler or test Butler's A1C or blood pressure during this period, as it would be impossible to perform these tests on a patient who does not present for an appointment. *See also id.* at 551:1-18, 576:13-577:2, 577:3-7 (Dr. Goulden testifying that Greenburgh's failure to examine Butler's feet or perform A1C testing during this period did not violate the standard of care).

Lastly, Dr. Davis adhered to the standard of care in promptly sending Butler to the emergency room at White Plains Hospital after observing her right foot. *Id.* at 494:20-495:12; 577:20-23. Dr. Davis responded to Butler's condition with the appropriate level of urgency that was demanded.

For these reasons, Greenburgh and its providers did not depart from any applicable standard of care in treating Butler.

### 2.    Causation

Nor has Butler established any causal link between any act or omission of Greenburgh or its employees and her injuries. "In order to establish proximate causation, a plaintiff must demonstrate that the defendant's deviation from the standard of care was 'a substantial factor in bringing about the injury.'" *Gonzalez*, 612 F. Supp. 3d at 345-46 (quoting *D.Y. v. Catskill Reg'l*

*Med. Ctr.*, 66 N.Y.S3d 368, 371 (3d Dep't 2017)).  Where "a plaintiff claims that a physician's acts or omissions decreased his or her chances of survival or cure, there is legally sufficient evidence of causation as long as the jury can infer that it was probable that some diminution in the chance of survival or cure has occurred."  *Mi Jung Kim v. Lewin*, 108 N.Y.S.3d 25, 27 (2d Dep't 2019).  This is called the "loss-of-chance doctrine."  *Gonzalez*, 612 F. Supp. 3d at 346. Importantly, "the substantial factor need not be the only cause which produces the injury." *Mortensen v. Memorial Hosp.*, 483 N.Y.S.2d 264, 270 (1st Dep't 1984).  Moreover, "[t]he [New York] Court of Appeals has recognized that '[t]he issue of causation in medicine is always difficult but, when it involves the effect of a failure to follow a certain course of treatment, the problem is presented in its most extreme form.'"  *Gerace v. United States*, No. 5:03-CV-166 (NPM/GHL), 2006 WL 2376696, at *19 (N.D.N.Y. Aug. 10, 2006) (quoting *Toth v. Cmty. Hosp. at Glen Cove*, 239 N.E.2d 368, 372 (N.Y. 1968)).  In such a case, a court can "only deal in probabilities since it can never be known with certainty whether a different course of treatment would have avoided the adverse consequences."  *Toth*, 239 N.E.2d at 372.

In this case, the Court credits Dr. Bar-David's expert opinion that Butler's amputation was a direct result of an aggressive, rapidly spreading, necrotizing skin infection in the heel area of her right foot.  Tr. at 597:8-16.  Such infections can occur in both healthy and immunocompromised people.  *See id.* at 622:19-25.  They develop rapidly and can become life-threatening within a matter of days.  *Id.* at 599:3-13.  This is precisely what happened to Butler.  The infection first appeared in or around March 12, 2019, when Aquira Butler, who took Butler to the hospital to visit her son, noted that Butler was low-energy, foggy, unable to walk without assistance, and smelled of dying flesh.  *Id.* at 393:9-23, 394:7-395:14, 399:19-400:17.  Moreover, as Dr. Bar-David credibly explained, Butler's medical records indicated that this infection was acute, became

critical in no more than several weeks, and inevitably caused her amputation.  *Id.* at 609:3-24, 612:13-19, 616:3-5; *see also id.* at 599:14-17, 602:21-24, 615:3-10, 617:4-15, 618:15-25, 626:11-24; JX-4 at 40, 60, 69, 71, 99 251, 254.

Given how rapidly this infection developed, as Dr. Bar-David testified, "there is no way" it could have been prevented by more routine visits to Greenburgh or more frequent foot examinations conducted there.  Tr. at 621:12-25.  Thus, there is no causation between Butler's right below-the-knee amputation and any alleged lack of annual diabetic foot examinations.[18] Indeed, Butler did not notice any infection during the foot examinations she conducted on herself, despite being a licensed nurse who had treated diabetic patients.  *Id.* at 34:14-35:2, 60:3-62:2.  And even if Greenburgh had reached out to Butler at just the right time (on March 12, 2019, for example), Butler has failed to prove by a preponderance of the evidence that she would have promptly scheduled an appointment.  Butler had been experiencing unrelated problems with her left foot from at least a year prior to the infection.  *Id.* at 351:14-23.  The problem was so significant that some of her left toes autoamputated while she was walking around her apartment.  *Id.* at 387:19-388:7.  Yet she still failed to schedule an appointment.  *Id.* at 419:17-23:7, 547:11-12.  It therefore is unlikely that Butler would have promptly scheduled a follow-up appointment for her right foot since, as Dr. Roth testified, such past noncompliance in patients is indicative of future noncompliance.  *Id.* at 444:3-9.

If anything, Butler's own negligence significantly contributed to the complications that necessitated her amputation.  When she finally did call Greenburgh to schedule an appointment in

---

[18] Nor would regular lab testing, including testing Butler's A1C and blood pressure, have prevented Butler's amputation, because, as Dr. Goulden testified, Butler's A1C level was still within a reasonable range when it was finally retested at White Plains Hospital in 2019, Tr. at 571:19-25; JX-4 at 134, and her blood pressure was better than the ADA target for diabetics, Tr. at 575:2-4; JX-4 at 41.

mid-March 2019, *id.* at 41:6-11, she did not advise the facility of the problems she was experiencing or express any urgency, *id.* at 41:12-16, 83:13-19.  Nor did she go to the emergency room.  *Id.* at 83:23-84:2.  Instead, she waited two weeks until her March 28, 2019 appointment .  *Id.* at 41:6-11.  This delay was critical.  As Dr. Bar-David testified, her infection passed the point of no return in no more than several weeks.  *Id.* at 609:3-24, 612:13-19, 616:3-5.  By the time she arrived at White Plains Hospital, antibiotics would not have worked.  *Id.* at 614:6-13.  Instead, Butler needed a guillotine amputation to prevent sepsis from further harming and possibly killing her.  *Id.* at 619:10-12.[19]

Butler argues that Greenburgh's supposed deviations from the standard of care caused her to develop neuropathy which made it harder for her to sense the infection developing in her right foot until it was too late.  *E.g.*, *id.* at 734:23-735:1, 735:24-736:9.  But there are several problems with this theory.  First, as Dr. Bar-David credibly opined, neuropathy cannot cause amputations, *id.* at 622:1-8, there is no evidence that peripheral vascular or arterial disease caused or contributed to Butler's condition requiring amputation, and there is no evidence that osteomyelitis in the forefoot second metatarsal resulted in the need for the amputation, *id.* at 627:11-22.  Rather, all of Butler's medical records focus on her right heel.  *Id.* at 627:11-22; *see also, e.g.*, JX-4 at 40, 49-50, 60-62, 69, 71, 99, 107, 254.  Second, Butler's medical records indicate that although she did have peripheral vascular disease, it was far more present in her left foot than the right, as documented by the April 1, 2019 ABI.  Tr. at 600:18-602:2, 613:13-19, 625:11-626:4; JX-4 at 254.  Third, even with neuropathy or eye problems as Butler claims, a reasonable person would still have been able to sense the infection in a timely manner.  As Dr. Goulden testified,

---

[19] Counsel for Butler acknowledged as much in his closing argument.  *See* Tr. at 739:7-9 ("We agree, that by the time it got to March 29, 2019, she was going to lose the foot, it was too late.").

> I would have expected her to see something, particularly given the fact that a few of her toes unfortunately and very sadly had fallen off.  But she also developed an active ulceration of the other foot.  I would have expected her to feel something.  I would have expected her unfortunately to smell something.  There can be a smell with this type of wound.

Tr. at 574:10-22; *see also id.* at 495:14-496:3 (Dr. Roth testifying consistently with Dr. Goulden).[20]

But more importantly, Greenburgh was not the proximate cause of Butler's neuropathy.  As Drs. Roth and Goulden testified, RNP Lynch's notes do not indicate that Butler ever complained about her feet during appointments.  *Id.* at 493:8-14, 556:10-11.  Greenburgh cannot be responsible for failing to affirmatively reach out to Butler concerning her feet.  *See Gerace*, 2006 WL 2376696, at *23 ("It is axiomatic that a doctor does not have a duty to evaluate unspoken complaints.").  Even so, RNP Lynch's notes show that she counseled and educated Butler at each appointment.  JX-1 at 17-18, 23, 29-30, 34-35, 40, 44-45, 52, 59, 69, 74; *see* Tr. at 572:21-24.  Moreover, Butler herself testified that she had ample experience treating diabetic patients with foot problems given her prior career as a nurse, and thus was familiar with proper foot care.  Tr. at 60:3-62:2; *see also id.* at 489:24-490:9 (Dr. Roth testifying that Butler was "fully trained" and would have been familiar with the techniques and treatments employed by RNP Lynch in treating her diabetes).  Specifically, Butler acknowledged that "being a nurse, [she] knew it was important to follow up about your own diabetes with a medical doctor" especially when experiencing foot problems.  *Id.* at 60:12-62:2.  But that is precisely what she failed to do.  When, between 2017 and 2019, her feet started to swell and became odorous, *id.* at 38:15-25, Butler did not schedule an

---

[20] The Court does not credit Butler's explanation that she thought she was smelling diarrhea.  *E.g.*, Tr. at 39:1-4.  As Dr. Goulden testified, Butler's injury would have resulted in a very distinct smell, *id.* at 574:10-22, and Dr. Davis, RN Knight, and even Aquira Butler all testified that the distinct odor they perceived did not resemble diarrhea, *id.* at 150:13-17 (Dr. Davis testifying that Butler smelled like "infection"); 346:10-348:7 (NP Knight testifying that Butler smelled like a "rotten . . . neglected ulcer" or "deadly" but not like diarrhea), 395:6-14 (Aquira Butler testifying that Butler did not smell like "poop," but rather smelled "like dying flesh").

appointment with a doctor, as she claimed she had done to her son and niece, *id.* at 374:10-15, 419:17-423:7, but instead took Tylenol, 80:20-21, self-dressed her foot with gauze and bandages, *id.* at 141:1-6, 370:6-7, 383:24-384:8; JX-1 at 10, and acquired larger boots to wear, Tr. at 35:21-36:7, 382:4-13.   As Dr. Goulden testified, it appears that this failure to act resulted in the unfortunate situation that required a below-the-knee amputation of Butler's right leg.   *Id.* at 579:1-5.

## V.  Conclusion

For the foregoing reasons, the Government is not liable to Butler for malpractice.  The Clerk of Court is respectfully directed to enter judgment in favor of the Government and to close this case.

SO ORDERED.

Dated: September 1, 2023
       New York, New York

_____
JOHN P. CRONAN
United States District Judge